AUG 04 2026
CLERK, U. S. DISTRICT COURT
MIDDLE DISTRICT OF FLORID
TAMPA FLORIDA

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| ADAPTIVE CLASSIFICATION TECHNOLOGIES LLC, | Case No. 8:26-cv-02257-VMC-SPF |
| *Plaintiff,* | |
| v. | DEMAND FOR A JURY TRIAL |
| KNOVOS, LLC, | |
| *Defendant.* | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Adaptive Classification Technologies LLC ("ACT" or "Plaintiff"), by and through its attorneys, brings this action and makes the following allegations of patent infringement relating to U.S. Patent No. 10,445,374 (the "'374 Patent" or the "patent-in-suit"). Defendant Knovos, LLC ("Knovos" or "Defendant") infringes the patent-in-suit in violation of the patent laws of the United States of America, 35 U.S.C. § 1 *et seq.*

### THE PARTIES

1.     ACT is a Texas limited liability company having its principal place of business at 5000 Plaza on the Lake, Suite 100, Austin, TX 78746.

2.     Upon information and belief, Knovos, LLC is a Florida limited liability company with its principal place of business at 8875 Hidden River Parkway, Suite 300, Tampa, Florida 33637. Upon information and belief, Knovos conducts business

in Florida, including in this District, and maintains its corporate headquarters in this District at 8875 Hidden River Parkway, Suite 300, Tampa, Florida 33637.

## NATURE OF THE ACTION, JURISDICTION, AND VENUE

3.     This action arises under the patent laws of the United States, Title 35 of the United States Code. Accordingly, this Court has exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

4.     This Court has personal jurisdiction over Knovos pursuant to due process and/or the Florida Long-Arm Statute. Knovos has sufficient minimum contacts with the forum because, inter alia, (i) Knovos is a Florida limited liability company, (ii) Knovos maintains its corporate headquarters and principal place of business in this District at 8875 Hidden River Parkway, Suite 300, Tampa, Florida 33637, (iii) Knovos has done and continues to conduct business in Florida, including in this District, and (iv) Knovos has, directly and through intermediaries, committed and continues to commit acts of patent infringement in Florida, including in this District.

5.     Venue is proper in this District under 28 U.S.C. § 1400(b) because Knovos resides in this District. Knovos is organized under Florida law and maintains its principal place of business in Tampa, Florida, within this District. Venue is independently proper because Knovos maintains a regular and established place of business in this District and has committed acts of infringement in this District.

2

## THE INVENTORS

6.    The inventors of the '374 Patent are Dr. Gordon V. Cormack and Dr. Maura R. Grossman. Each played a pivotal role in the creation and reduction to practice of the patented technology claimed in the '374 Patent.

7.    Dr. Gordon V. Cormack earned his B.Sc., M.Sc., and Ph.D. in computer science from the University of Manitoba in 1977, 1978, and 1981, respectively. After graduating, Dr. Cormack taught at McGill University before joining the University of Waterloo in 1983. These educational experiences provided the scholarly foundation for his pioneering work in compression, search, and e-discovery.

8.    Over a four-decade career, Dr. Cormack has published more than 100 peer-reviewed papers and co-authored the graduate textbook Information Retrieval: Implementing and Evaluating Search Engines (MIT Press, 2010). Among his most acclaimed papers is his 2008 paper titled "Novelty and Diversity in Information Retrieval Evaluation," which received the 2019 ACM SIGIR (Special Interest Group on Information Retrieval) Test-of-Time Award.

9.    Dr. Cormack has shaped benchmark-setting initiatives as a long-time program-committee member of NIST's Text Retrieval Conference, coordinating the Spam (2005–07), Legal (2010–11), and Total Recall (2015–16) tracks, and he served as president of the Conference on Email and Anti-Spam.

3

10.    In addition to advancing the research field and the state of the art, Dr. Cormack also helped guide the next generation of innovators. For over a decade, Dr. Cormack coached the University of Waterloo's ACM International Collegiate Programming Contest teams, guiding them to the World Finals every year of his tenure and helping them capture the World Championship in 1999 (along with North American titles in 1998 and 2000).

11.    Dr. Cormack is the co-inventor of both Dynamic Markov Compression (DMC) and Continuous Active Learning® (CAL®). His and Dr. Grossman's research on technology-assisted review has been cited by courts in the United States, Ireland, and the United Kingdom when approving predictive-coding workflows.

12.    Dr. Cormack is currently professor emeritus at the David R. Cheriton School of Computer Science at the University of Waterloo and continues to actively consult in the fields of machine learning and AI-assisted review.

13.    Dr. Maura R. Grossman, Dr. Cormack's peer and co-inventor, is a research professor at the University of Waterloo's Cheriton School of Computer Science, cross-appointed to the School of Public Health Sciences, and the principal of her own consulting business. She also holds an adjunct post at Osgoode Hall Law School and has taught e-discovery at Columbia and Georgetown.

14.    Dr. Grossman earned an A.B., magna cum laude, from Brown University, followed by her M.A. and Ph.D. in Psychology from the Gordon F.

Derner Institute of Advanced Psychological Studies at Adelphi University. She later obtained her J.D., magna cum laude and Order of the Coif, from Georgetown University Law Center, where she served as Executive Notes & Comments Editor of the Georgetown Law Journal. These multidisciplinary credentials—combined with her research professorship in computer science—laid the foundation for her pioneering contributions to technology-assisted review and electronic discovery.

15.　For seventeen years, Dr. Grossman was Of Counsel at Wachtell, Lipton, Rosen & Katz, where she led e-discovery and information-governance strategy for Fortune 100 clients.

16.　Dr. Grossman's landmark 2011 article "Technology-Assisted Review in E-Discovery Can Be More Effective and More Efficient than Exhaustive Manual Review," co-authored with Dr. Cormack, is a canonical guide for technology-assisted review, providing empirical proof that predictive coding can outperform manual review. It is now a staple citation in judicial opinions worldwide.

17.　Courts frequently appoint Dr. Grossman as a special master or discovery expert—most notably in the Southern District of New York—to design and monitor TAR protocols, and she co-led NIST's TREC Legal (2010–11) and Total Recall (2015–16) tracks, setting industry benchmarks.

18.　Like Dr. Cormack, Dr. Grossman also played a pivotal role in guiding the next generation of innovators. In 2019, she was named Director of Women in

Computer Science at Waterloo, and she taught the interdisciplinary course "Artificial Intelligence: Law, Ethics, and Policy."

19. Dr. Grossman has received numerous awards for her scholarship and contributions to the field, including the American Bar Association's 2016 "Legal Rebel" designation, inclusion in the 2017 Fastcase 50 list of legal innovators, and recognition by Who's Who Legal (2020) as a National and Global e-Discovery Leader.

20. In addition to the above accolades, Dr. Cormack and Dr. Grossman are named inventors on almost a dozen patents (the "Cormack/Grossman patents") in the fields of machine learning, technology-assisted document review, and active document processing.

21. These patents have been cited in hundreds of U.S. patents and published patent applications as prior art before the United States Patent and Trademark Office. Companies whose patents cite the Cormack/Grossman patents include:

- Microsoft Corporation

- Open Text Corporation

- International Business Machines Corporation

- Nuix North America

- Canon Inc.

- Ford Motor Company

6

- Oracle Corporation

- SAP SE

- AT&T Inc.

- Fujitsu Limited

- Xerox Corporation

- Kyocera Corporation

- Nokia Corporation

- Relativity ODA LLC

- Bank of America Corporation

## TECHNOLOGY BACKGROUND

22. Electronic discovery ("e-discovery") traces its roots to early efforts to process computer-generated evidence in the 1960s. The modern era began when full-text retrieval systems—such as Concordance—debuted in the mid-1980s, allowing lawyers to keyword-search digital pages rather than flip through boxes of paper records.

23. Early milestones include the 1970 amendment to Federal Rule 34 authorizing discovery of "electronic data compilations," and the creation of the Electronic Discovery Reference Model (EDRM) in 2005, which described the now-familiar stages of preservation, processing, review, and production.

7

24. By the late 1990s, everyday email use and network backups had multiplied data volumes, setting the stage for Judge Shira Scheindlin's Zubulake rulings (2003–2005). See Zubulake v. UBS Warburg LLC, 229 F.R.D. 422 (S.D.N.Y. 2004). Those decisions underscored that litigants must preserve and produce relevant digital documents, including email, even when they reside on difficult-to-restore backup tapes—highlighting the need for software that could search, de-duplicate, and review massive collections defensibly.

25. The 2006 amendments to the Federal Rules of Civil Procedure expressly addressed e-discovery, defining "electronically stored information" ("ESI") in Rules 16, 26, 33, 34, 37, and 45 and introducing Rule 26(b)(2)(B), which excuses production of ESI that is "not reasonably accessible because of undue burden or cost." Those amendments helped drive demand for review platforms— such as Concordance, Summation, IPRO, and early versions of Relativity—that converted native files to TIFF images, paired them with load files, and drove attorney review through static keyword hit lists.

26. While those systems were sufficient for their time, they were quickly overwhelmed by the volume of data expected to be processed and reviewed.

27. From the mid-1980s to the early 2000s, the cost to store data fell by orders of magnitude, and corporate data volumes increased commensurately—

making purely linear keyword review untenable or, at best, unreasonably expensive for many matters.

28. Vendors introduced concept-clustering, near-duplicate detection, and email threading. Yet reviewers still had to craft broad search strings and perform manual quality control, leaving many responsive documents undiscovered and review costs spiraling. These pressures led to experimentation with machine-learning techniques to classify documents more efficiently—the seeds of technology-assisted review ("TAR").

29. In 2011, Dr. Maura R. Grossman and Dr. Gordon V. Cormack published research demonstrating that supervised learning could achieve higher recall than exhaustive manual review at a fraction of the effort. Within a year, Magistrate Judge Andrew Peck cited that research in Da Silva Moore v. Publicis Groupe—an early federal opinion approving "predictive coding." See 287 F.R.D. 182 (S.D.N.Y. 2012).

30. Early "TAR 1.0" implementations commonly used sizeable seed sets, staged training rounds, and often employed curated control samples to measure recall. In such workflows, a model would be trained on an initial set of documents, then applied to remaining documents in the collection; models were typically updated only after additional rounds of training.

31.    Commentators later contrasted TAR 1.0 with TAR 2.0 methods that provided more flexible, continuous learning.

32.    In 2014–2015, Drs. Cormack and Grossman introduced Continuous Active Learning® (CAL®)—a protocol that retrains as coding progresses and dynamically re-ranks the corpus. Peer-reviewed evaluations beginning with the SIGIR study—and extended in follow-up work—reported efficient, high-recall results using continuous learning.[1]

33.    CAL®'s reported effectiveness spurred rapid commercial adoption. Major platforms introduced continuous-learning capabilities, and cloud-based tools highlighted speed and machine-learning-driven culling as key advantages.

34.    In 2019, industry bodies such as EDRM published TAR guidelines recognizing continuous-learning approaches, including CAL®, as widely accepted for high-recall workflows.

35.    Today, TAR platforms often layer continuous learning with concept analytics, communication mapping, and (increasingly) summarization tools, enabling counsel to interrogate large digital repositories efficiently.

### THE PATENT-IN-SUIT - U.S. PATENT NO. 10,445,374

36.    U.S. Patent No. 10,445,374, entitled "Systems and Methods for Conducting and Terminating a Technology-Assisted Review," was filed on June 17,

---

[1] CAL® is often referred to as TAR 2.0.

2016 and claims priority to June 19, 2015. The '374 Patent is valid and enforceable. A true and correct copy of the '374 Patent is attached hereto as Exhibit A.

37.    The '374 Patent discloses systems and methods for determining when to terminate a classification process such that classifiers generated during iterations of the classification process accurately classify documents in a collection (e.g., as relevant or non-relevant) and achieve high quality "within a certain level of assurance," i.e., high reliability. Ex. A, 4:8–17.

38.    The '374 Patent addresses modern ESI scale by beginning with a target set (T) of documents identified as relevant. As the specification explains:

> "In step **1020**, relevant documents are identified in a document collection to create a target set T. Following or during identification of the target set T, an indication of the documents in the target set T may be received. In certain embodiments, documents in T are identified by selecting documents at random from the document collection, presenting the document to one or more reviewers, and then adding the document to the set T if the reviewer indicates the document is 'relevant.'"

Ex. A, 6:63–7:14.

39.    Once the target set T exists, the '374 Patent directs the machine to "execute the classification process that enables training of a classifier using documents in the target set ...." Ex. A, 18:33–34.

40.    The patent then specifies that the classification process "utilize[s] a second iterative search strategy which does not distinguish between documents in the target set and documents in the document collection to classify documents in the document collection." Ex. A, 18:35–39.

11

41.    While the specification does not limit the second strategy to any single implementation, it expressly contemplates that it may be "a TAR process" and, in particular, "a CAL approach, which retrieves and/or classifies the most likely relevant documents from the collection." Ex. A, 7:26–29.

42.    Finally, the '374 Patent requires that the workflow "terminate the classification process based upon a comparison between the results of the second search strategy and a characteristic of the target set ... wherein the classification process achieves a target level of recall with a certain probability upon termination." Ex. A, 18:40–45.

43.    The '374 Patent addresses what the specification calls "one of the most vexing problems" in technology-assisted review: knowing when an iterative computer-classification process has done enough to permit review to end without exhaustive manual review. Ex. A, 3:20–30, 5:18–30.

44.    The problem was not simply making document review faster. Existing approaches could converge to a suboptimal classifier, and it could be difficult to determine reliably when a sufficient result had been reached. Ex. A, 3:15–30, 3:55–61.

45.    Claim 1 addresses that problem through the particular ordered combination it recites, including an identified target set, classifier training, a second

iterative search strategy, and termination based on a comparison involving the results of that strategy. Ex. A, 18:23–45.

46.     The specification explains that the improvement arises from the system's "overall configuration," not merely from using computer technology to increase classification speed, and describes it as a "fundamental improvement" in information classification. Ex. A, 6:20–25.

47.     As of the '374 Patent's June 2015 priority date, the ordered combination recited in claim 1 was not well-understood, routine, or conventional.

48.     The prosecution history supports that allegation. The Examiner found the applicants' June 18, 2019 response persuasive and stated that the prior art of record failed to teach the claim 1 limitation addressing classifier training, the second iterative search strategy, and comparison-based termination. See Aug. 14, 2019 Notice of Allowability at 2.

## FACTUAL ALLEGATIONS REGARDING KNOVOS DISCOVERY

49.     The '374 Patent is valid and enforceable.

50.     ACT is the owner and assignee of all rights, title, and interest in the '374 Patent, including the rights to grant licenses, to exclude others, and to recover past damages for infringement of that patent.

51.     Upon information and belief, Knovos makes, uses, offers to sell, sells, licenses, and/or provides access in the United States to the Knovos Discovery

eDiscovery platform, including versions and deployments configured to perform the workflows alleged below using Technology Assisted Review ("TAR"), predictive coding, Continuous Active Learning ("CAL"), related machine-learning document-classification functionality, and associated review-quality and reporting functionality (the "Accused Instrumentality" or "Knovos Discovery").

52.    Upon information and belief, Knovos Discovery uses predictive coding and Continuous Active Learning ("CAL") to classify and prioritize documents during review. Knovos states that its TAR system learns coding patterns from sample documents reviewed by experts and applies those patterns to categorize documents in the collection, while providing quality-control capabilities such as conflicting-decision reports. See, e.g.,

---

**The Solution:**

Our TAR (Technology Assisted Review) technology uses predictive coding and Continuous Active Learning (CAL) to improve the document review experience and solve significant eDiscovery challenges such as time limitation and high cost. The solution is completely integrated with our document review platform to maximize its usage on large data sets in minimal time.

It provides efficient methodologies for case teams to prioritize, categorize, or qualify documents during the review process. Additionally, the solution has quality control capabilities, including random sampling and conflicting decision reports that quickly identify inconsistencies in decisions between different document groups.

---

https://www.knovos.com/solutions/ediscovery/technology-assisted-review-tar/

53. Upon information and belief, Knovos Discovery comprises at least one computing device having a processor and physical memory, the physical memory storing instructions.

54. Upon information and belief, Knovos Discovery receives an identification of a target set of documents in a document collection—namely, documents identified as relevant through a first search strategy—and stores those documents on non-transitory storage media for use in its TAR workflows. Knovos explains that its analytics identify relevant documents based on search terms and key players, that its TAR workflows use those documents to "kick-start" active learning, and that the active-learning engine learns from the coding of relevant documents and delivers more of those types of documents for review. See, e.g.,

> Content clusters coupled with data visualization to narrow in on relevant documents based on search terms and key players you've determined as important. The TAR workflows use those documents to kick-start active learning at the outset of the attorney review. The active learning engine will have a solid understanding of what's relevant, based on the coding of relevant documents, and will deliver more of those types of documents to the attorney review team.

https://www.knovos.com/white-papers/explore-new-frontiers-in-ediscovery-with-data-analytics-and-machine-learning/

55. Upon information and belief, Knovos Discovery executes a classification process that trains a classifier using the reviewer-identified target-set

documents described above and iteratively applies that classifier to rank and classify documents in the collection. Knovos states that its TAR 2.0 with AI Tag Classification "learned from subject-matter experts' decisions and predicted tags across the broader set." Knovos further explains that "[a]s reviewers tag documents, the model learns, rescans, and ranks the most relevant files first." Upon information and belief, in at least some configurations, Knovos applies the evolving classifier across the selected document collection and treats target-set documents like other documents in the collection, including by applying the classifier's ranking and classification process without excluding documents based solely on their target-set membership. See, e.g.,

## How the work moved forward

 TAR 2.0 with AI Tag Classification learned from subject-matter experts' decisions and predicted tags across the broader set, directing attention to higher-value material sooner

https://www.knovos.com/case-studies/global-pharma-firm-meets-injunction-deadline-with-knovos-discovery-tar-2-0/

**FASTER PRIORITIZATION**

## AI Prioritized Review

Continuous Active Learning. As reviewers tag documents, the model learns, rescans, and ranks the most relevant files first, helping teams focus on likely responsive or high-risk material sooner.

https://www.knovos.com/solutions/ediscovery/data-breach-review

56.    Upon information and belief, Knovos Discovery compares the results of its iterative TAR classification process with reviewer-determined relevance, including the relevance characteristic of documents in the target set. Knovos uses this comparison, together with confidence-based estimates of recall, to determine whether further training is needed and whether the classification process should end. Knovos instructs users to compare TAR results with existing responsiveness coding and identify documents that reviewers marked responsive but TAR classified as nonresponsive. Knovos also displays a TAR_Check dashboard containing information about the cumulative source, including review percentage, recall, the number of documents qualifying for review, TAR score range, richness, cutoff score, precision, and F-measure. Knovos directs users to evaluate relevant documents missed by TAR to determine whether additional training is required and states that training continues until the selected target recall is achieved. Upon information and belief, in at least some configurations, Knovos Discovery terminates the classification process, or enables users to terminate it, when the comparison and confidence-based recall estimate indicate that the selected target recall has been achieved. *See, e.g.,*



## Identify Loopholes

Leverage TAR to perform a quick round of QC for the production dataset. Compare the TAR results with your production dataset and spot any inconsistencies or loopholes in responsive or privileged documents. You may find some documents marked as responsive in your production set, but TAR qualified the same documents to be non-responsive. Identifying such documents and taking the final call on them is imperative for error-free production.

https://www.knovos.com/wp-content/uploads/2025/09/Knovos-Discovery-TAR_Module_v2.pdf

## TAR Validation Process in Detail

The TAR validation process involves a series of steps to measure and ensure its accuracy and reliability:

- ✓ **Recall Measurement:** Recall is a statistical measure that estimates the proportion of relevant documents correctly identified by TAR out of all relevant documents in the dataset. It requires random sampling, with parameters including richness (the proportion of relevant documents), confidence level and interval. These parameters determine the necessary sample size to achieve the desired confidence level in the recall estimate.

- ✓ **Workflow Consideration:** Setting a target recall level is beneficial before starting TAR. The training process continues until this recall level is achieved. However, if the training becomes disproportionate to the goal (i.e. too many documents are needed for training), the target recall may need to be adjusted.

https://www.knovos.com/guides/ediscovery-guide/chapter-9-tar-technology-assisted-review/

18



https://www.knovos.com/white-papers/explore-new-frontiers-in-ediscovery-with-data-analytics-and-machine-learning

57.    Upon information and belief, Knovos has had knowledge of the '374 Patent since at least March 12, 2026, when it received ACT's letter identifying the '374 Patent and advising Knovos that, after detailed analysis, ACT believed Knovos's software infringed at least claim 1 of the '374 Patent. The letter identified Knovos's document-review webpage and TAR guide as examples.

19

## COUNT I
## DIRECT INFRINGEMENT OF U.S. PATENT NO. 10,445,374

58. ACT incorporates paragraphs 1 through 5 and 36 through 57 as if fully set forth herein.

59. Upon information and belief, Knovos has directly infringed and continues to directly infringe one or more claims of the '374 Patent, including at least claim 1, by making, using, offering to sell, selling, licensing, and/or providing access in the United States to configurations of Knovos Discovery that perform the workflows alleged above. Those configurations meet each limitation of claim 1 as alleged above. See 35 U.S.C. § 271(a).

60. Despite ACT's notice, Knovos has continued the direct-infringement conduct alleged above. Upon information and belief, Knovos's direct infringement since March 12, 2026, has been willful. ACT therefore seeks enhanced damages under 35 U.S.C. § 284.

61. As a result of Knovos's direct infringement of the '374 Patent, ACT has suffered monetary damages in an amount to be determined at trial, but no less than a reasonable royalty, together with pre- and post-judgment interest and costs as provided by law.

20

## COUNT II
## INDUCED INFRINGEMENT OF U.S. PATENT NO. 10,445,374

62.    ACT incorporates paragraphs 1 through 5 and 36 through 57 as if fully set forth herein.

63.    Upon information and belief, at least since March 12, 2026, Knovos has induced and continues to induce infringement of one or more claims of the '374 Patent, including at least claim 1, under 35 U.S.C. § 271(b).

64.    At least since receiving ACT's March 12, 2026 notice letter, Knovos has known that customers and end users in the United States directly infringe at least claim 1 when they use the accused functionality in the manner alleged above, and has known that those customer and end-user acts constitute infringement.

65.    Through its product webpages, guides, and white papers, Knovos affirmatively encourages and instructs customers and end users to operate Knovos Discovery's TAR and CAL functionality in the manner alleged above. Knovos has continued this conduct after receiving ACT's notice and, upon information and belief, did so with the specific intent to cause customers and end users to perform those infringing acts.

66.    As a result of Knovos's induced infringement of the '374 Patent, ACT has suffered monetary damages in an amount to be determined at trial, but no less than a reasonable royalty, together with pre- and post-judgment interest and costs as provided by law.

21

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff ACT respectfully requests that this Court enter:

1. A judgment in favor of ACT that Knovos has directly infringed the '374 Patent, either literally or, in the alternative, under the doctrine of equivalents;

2. A judgment in favor of ACT that Knovos has induced infringement of the '374 Patent;

3. A judgment that Knovos's direct infringement of the '374 Patent is willful;

4. An award of damages resulting from Knovos's acts of infringement in accordance with 35 U.S.C. § 284;

5. A judgment that this case is exceptional under 35 U.S.C. § 285 and awarding ACT its reasonable attorneys' fees, costs, and expenses incurred in this action;

6. A judgment and order requiring Knovos to provide accountings and to pay supplemental damages, including, without limitation, pre-judgment and post-judgment interest; and

7. Any and all other relief to which ACT may be entitled.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), ACT requests a trial by jury of all issues so triable by right.

Dated:  August 4, 2026                                    Respectfully Submitted,

/s/ *Bradford J. Black*
Bradford J. Black
Lead Counsel
bblack@bradfordblack.com
**BRADFORD BLACK P.C.**
500 W. 2nd Street, Suite 1900
Austin, TX 78701
Telephone: (415) 813-6211
Facsimile: (415) 813-6222

*Attorneys for Plaintiff*
ADAPTIVE CLASSIFICATION
TECHNOLOGIES LLC